# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JONNIE LOMAX and HAROLD LOMAX, On Behalf of Themselves and All Others Similarly Situated, | ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 1:16-cv-923 |
| v. | ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| KRISPY KREME DOUGHNUTS, INC., TIM E. BENTSEN, CHARLES A. BLIXT, LYNN CRUMP-CAINE, CARL E. LEE, JR., C. STEPHEN LYNN, ROBERT S. MCCOY, JR., JAMES H. MORGAN, ANDREW J. SCHINDLER, LIZANNE THOMAS, and ANTHONY THOMPSON, | ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

Plaintiffs Jonnie Lomax and Harold Lomax ("Plaintiffs"), by and through their undersigned counsel, for their complaint against defendants, allege upon personal knowledge with respect to themselves, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is a class action brought on behalf of the public shareholders of Krispy Kreme Doughnuts, Inc. ("Krispy Kreme" or the "Company") against Krispy Kreme and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act")

and Rule 14a-9 promulgated thereunder and to enjoin the vote on a proposed transaction, pursuant to which Krispy Kreme will be acquired by JAB Holdings B.V. ("JAB Holdings") through JAB Holdings' wholly-owned subsidiaries Cotton Parent, Inc. ("Parent") and Cotton Merger Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2. On May 9, 2016, Krispy Kreme and JAB Beech Inc. ("JAB Beech"), an affiliate of Parent, issued a joint press release announcing that they had entered into an Agreement and Plan of Merger dated May 8, 2016 (the "Merger Agreement") to sell Krispy Kreme to JAB Holdings. Under the terms of the Merger Agreement, JAB Holdings will acquire all outstanding shares of Krispy Kreme for $21.00 in cash per Krispy Kreme common share (the "Merger Consideration"). The Proposed Transaction is valued at approximately $1.35 billion.

3. The Proposed Transaction is the result of an unfair process and provides the Company's shareholders with inadequate consideration. As further described below, both the value to Krispy Kreme shareholders contemplated in the Proposed Transaction and the process by which defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiffs and the other public shareholders of the Company.

4. Furthermore, the Board agreed to lock up the deal with a number of coercive deal protection devices in the Merger Agreement, including: (i) a "no-solicitation" clause that prevents the Company from soliciting, and subject to minimal exceptions, from providing non-public information to potential alternate bidders; (ii) an "information rights" provision that requires the Company to promptly advise JAB Holdings of any proposal or inquiries received from other parties, including the material

2

terms and conditions of the proposal and the identity of the party making the proposal; (iii) "matching rights" that allow JAB Holdings three (3) business days to match any superior offer; (iv) a "no-waiver" provision restricting the Company and its subsidiaries from terminating, amending, modifying or waiving any material provision of any confidentiality or similar agreement to which Krispy Kreme or any of its subsidiaries is a party; and (v) a provision requiring Krispy Kreme to pay a termination fee of $42 million if the Company decides to pursue a competing offer. The collective effect of these provisions is to chill any potential post-deal market check.

5.     Additionally, Krispy Kreme insiders stand to gain handsomely from the Proposed Transaction. In addition to gaining liquidity for their otherwise illiquid shares and options, Company management is expected to continue in their positions after closing and Krispy Kreme will continue to operate as an independent standalone entity. Motivated by the lucrative incentives of potential continued employment and substantial payments upon closing, the Board voted unanimously to approve the Proposed Transaction. Further, the Company's financial advisor, Wells Fargo Securities, LLC ("Wells Fargo") owns nearly 8% of Krispy Kreme's outstanding shares—representing a significant conflict of interest.

6.     Finally, compounding the unfairness of the Proposed Transaction, on June 27, 2016, Krispy Kreme filed a Definitive Proxy Statement on Schedule14A (the "Proxy") with the U.S. Securities and Exchange Commission ("SEC"). The Proxy, which recommends that Krispy Kreme shareholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things:

(i) the valuation analyses prepared by Wells Fargo in connection with the rendering of its fairness opinion; (ii) Krispy Kreme management's projections, utilized by Wells Fargo in its financial analyses; and (iii) material information concerning the sale process leading up to the Proposed Transaction. The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as shareholders need such information in order to cast a fully-informed vote in connection with the Proposed Transaction.

7.     In short, the Proposed Transaction is designed to unlawfully divest Krispy Kreme's public shareholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company shareholders. To remedy defendants' Exchange Act violations, Plaintiffs seek to enjoin the shareholder vote on the Proposed Transaction unless and until such problems are remedied.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act.

9.     This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

4

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiffs' claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  Krispy Kreme is incorporated in North Carolina and is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

11.    Plaintiff Jonnie Lomax is, and has been at all times relevant hereto, a continuous shareholder of Krispy Kreme.

12.    Plaintiff Harold Lomax is, and has been at all times relevant hereto, a continuous shareholder of Krispy Kreme.

13.    Defendant Krispy Kreme is a North Carolina corporation with its principal executive offices located at 370 Knollwood Street, Winston-Salem, North Carolina 27103.  The Company is a leading branded specialty retailer and wholesaler of premium quality sweet treats and complementary products, including its signature Original Glazed® doughnut.  Krispy Kreme's common stock is traded on the New York Stock Exchange under the ticker symbol "KKD."

14.    Defendant Tim E. Bentsen ("Bentsen") has been a director of the Company since 2014.  Defendant Bentsen is a member of the Audit Committee.

15.    Defendant Charles A. Blixt ("Blixt") has been a director of the Company since 2007.  Defendant Blixt is a member of the Audit Committee.

16.     Defendant Lynn Crump-Caine ("Crump-Caine") has been a director of the Company since 2007.  Defendant Crump-Caine is Chair of the Compensation Committee, and is a member of the Nominating and Corporate Governance Committee.

17.     Defendant Carl E. Lee, Jr. ("Lee") has been a director of the Company since 2014.  Defendant Lee is a member of the Compensation Committee.

18.     Defendant C. Stephen Lynn ("Lynn") has been a director of the Company since 2007.  Defendant Lynn is a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

19.     Defendant Robert S. McCoy, Jr. ("McCoy") has been a director of the Company since 2003.  Defendant McCoy is Chair of the Audit Committee.

20.     Defendant James H. Morgan ("Morgan") has been Chairman of the Board since 2005 and a director of the Company since 2000.  Defendant Morgan was previously Executive Chairman of the Board from June 2014 to January 2015, Chief Executive Officer ("CEO") from 2008 to June 2014, and President from 2007 to November 2011 and April 2012 to June 2014.

21.     Defendant Andrew J. Schindler ("Schindler") has been a director of the Company since 2006.  Defendant Schindler is a member of the Compensation Committee.

22.     Defendant Lizanne Thomas ("Thomas") has been a director of the Company since 2004.  Defendant Thomas is Chair of the Nominating and Corporate Governance Committee, and is a member of the Audit Committee.

23.     Defendant Anthony Thompson ("Thompson") has been President and CEO of the Company since June 2014.

24.     Defendants Bentsen, Blixt, Crump-Caine, Lee, Lynn, McCoy, Morgan, Schindler, Thomas and Thompson are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

25.     JAB Holding Company is a privately held group that specializes in long term investments in companies with premium brands in the Consumer Goods category.

26.     JAB Beech Inc. is an indirect controlled subsidiary of JAB Holding Company.

27.     JAB Holdings is a private limited liability company incorporated under the laws of the Netherlands and a party to the Merger Agreement.  JAB Holdings is a 100% subsidiary of JAB Holding Company.

28.     Parent is a Delaware corporation, an affiliate of JAB Holdings, and a party to the Merger Agreement.

29.     Merger Sub is a North Carolina corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

30.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Krispy Kreme common stock (the "Class").  Excluded from the Class are defendants and their

affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

31.    Plaintiffs' claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

32.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members in the Class. As of June 24, 2016, there were approximately 61,013,693 shares of Company common stock issued and outstanding. All members of the Class may be identified from records maintained by Krispy Kreme or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

33.    Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, among *inter alia*:

(a)    Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)    Whether Plaintiffs and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

34.    Plaintiffs will fairly and adequately protect the interests of the Class, and have no interests contrary to or in conflict with those of the Class that Plaintiffs seek to

8

represent. Plaintiffs have retained competent counsel experienced in litigation of this nature.

35. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

36. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background and Strong Financial Outlook

37. Founded in 1937, Krispy Kreme had an initial public offering on April 5, 2000. The Company is a global doughnut company and coffeehouse chain based in Winston-Salem, NC. Krispy Kreme's yeast-raised recipe was developed by a French chef from New Orleans before the Great Depression. The Company has expanded over time from a single location in Winston-Salem to its products being sold in over 1,100 shops in 27 countries. Krispy Kreme's Facebook page has over 5.2 million followers, and the iconic brand enjoys licensing agreements that permit its products to be sold in supermarkets, convenience stores, gas stations and retail shops.

38. The Company and its franchisees sell products through its on-premises and consumer packaged goods ("CPG") channels. For the Company's on-premises channels, sales to customers are made at Company and franchise stores, including sales made

through drive-thru windows, along with discounted sales to community organizations that in turn sell Krispy Kreme products for fundraising purposes. For the Company's CPG channels, the sale of Krispy Kreme products is made primarily on a branded basis to a variety of retail customers, including convenience stores, grocery stores and mass merchants and other food service and institutional accounts. These retail customers display and resell the products from self-service display cases, and in packages merchandised on stand-alone display units or on the retailer's shelf.

39.     Krispy Kreme began licensing complementary products in the beverage category when the Company signed an agreement for a test of Krispy Kreme-branded coffee at approximately 100 wholesale club locations located in the southeastern U.S. In 2014, the Company signed agreements for the introduction of Krispy Kreme-branded ready-to-drink coffee beverages in bottles for distribution at approximately 900 mass merchant locations throughout the U.S. Krispy Kreme also signed an agreement with Keurig Green Mountain, Inc. ("Keurig") to bring Krispy Kreme branded coffee to the Keurig brewing system. Keurig was acquired by JAB Holdings in December 2015. The Company has begun licensing its brand to be used on other products, and has an agreement with a major beverage firm to roast and distribute twelve-ounce bags of Krispy Kreme ground coffee.

40.     The Company celebrated the opening of its 1000th store and its 800th store outside of the U.S. in 2015. Part of Krispy Kreme's growth has been facilitated by the Company's domestic and international franchising.

10

41.    In September 2012, *QSR* magazine published an article entitled "The 75-Year Roller Coaster," which examined how Krispy Kreme had survived for 75 years by focusing on a single, successful product.  In the article, defendant Morgan is quoted as stating: "One thing that really gave us a head start is [we have] that one product that, darn it, just happens to be the best product in the world.  I know there should be something more complicated than that, but I'm not sure there is."  When asked if Krispy Kreme was a novelty that would wear off, defendant Morgan responded that "the answer is no.  I think it's not really novel; it's almost a staple … I really don't worry about it being a trend or a fad or being out-motored."

42.    The Company's recent financial results underscore its promising prospects.  On September 9, 2015, the Company reported its financial results for the second quarter of 2015.  For the quarter, Krispy Kreme reported a 5.7% increase in revenues to $127.3 million, compared to revenues of $120.5 million year over year.  Operating income rose 11.6% to $10.7 million, compared to operating income of $9.6 million year over year.  During the third quarter, Krispy Kreme repurchased 1.5 million shares of its common stock at a total cost of $26.9 million, of which $25.5 million was settled during the quarter.  Commenting on the financial results, defendant Thompson stated:

> Systemwide domestic same store sales were strong, increasing 5.5% and both Company Stores same store sales and traffic were positive for the quarter. We continue to be more strategic in our use of promotional incentives as we balance driving consistent same store sales growth and overall store level profitability. We were pleased with our retail sales performance; however, Company Stores segment profitability was negatively impacted by lower than anticipated results within our consumer packaged goods category. This, combined with some charges associated

with our derivative instruments, resulted in us adjusting our financial outlook for fiscal 2016.

43. On December 8, 2015, Krispy Kreme issued a press release announcing its financial results for the third quarter of 2016. The Company reported a 4.6% increase in revenues to $128.5 million, compared to revenues of $122.9 million year over year. Operating income rose 3.8% to $13.4 million, compared to operating income of $12.9 million year over year. During the third quarter, Krispy Kreme repurchased 890,000 shares of its common stock at a total cost of $15.7 million. Commenting on the impressive financial results, defendant Thompson stated:

> Third quarter results were in line with our expectations. Continued strong systemwide domestic same store sales reflected our effective use of promotional incentives such as 'special event' days and premium-priced limited time offers which drove both sales and traffic. We remain focused on growing at a prudent pace and continuing to return excess capital to shareholders through ongoing share repurchases.
>
> We are on track to open over 130 net new Krispy Kreme shops around the world in fiscal 2016. More importantly, we continue managing Krispy Kreme for the long-term by focusing on the tremendous opportunities we see for our iconic brand. Our energies are centered on driving sales, profitability and reducing investment costs at small retail shops which will strengthen our domestic expansion model for both Company and franchise development. We also continue to expand our pipeline for international franchise development with the signing of agreements in seven new countries this year. In addition, we are pleased to be spreading the joy of Krispy Kreme to U.S. troops and their families at military bases across much of Europe through a new partnership with the Army & Air Force Exchange Service. At home and abroad, we believe there is a strong demand for our products and brand.

44. On March 22, 2016, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year ended January 31, 2016. For the fourth quarter, Krispy Kreme reported a 4.0% increase in revenues to $130.4 million,

compared to revenues of $125.4 million year over year. Operating income rose 12.1% to $10.7 million, compared to operating income of $9.6 million year over year. For the fiscal year, the Company reported a 5.8% increase in revenues to $518.7 million, compared to revenues of $490.3 million year over year. Operating income for the fiscal year rose 8.0% to $52.1 million, compared to operating income of $48.2 million year over year. Commenting on these favorable results, defendant Thompson remarked:

> We are pleased with continued growth of the Krispy Kreme brand throughout fiscal 2016. During the year, we increased total revenue by almost 6%, adjusted earnings per share by 14%, operating cash flow by 26% and expanded our worldwide store count by 14% to over 1,100 stores. Systemwide domestic same store sales also rose nearly 4% as we had our seventh consecutive year of positive same store sales at Company stores. We thank our entire team and our franchise partners for their contributions to our ongoing success.

> We believe fiscal 2017 will be another year of sustainable growth as we partner with new and existing franchisees to spread the joy of Krispy Kreme throughout the world. As part of these efforts, we are refining our retail store model to deliver better returns while executing on our four key business drivers: accelerating global growth; leveraging technology; enhancing our core menu; and maximizing brand awareness. We remain excited about our brand's long-term potential and believe we are well positioned to drive earnings and cash flow growth in the future. We also plan to continue returning a significant portion of our excess cash flow to shareholders via on-going share repurchases.

## The Flawed Sale Process

45.     From inception, the Board performed a fundamentally flawed process to sell the Company. While the Board had the opportunity on multiple occasions to canvass the market to determine whether higher value was attainable for the Company's assets and to its shareholders, the Board members negotiated **solely and exclusively** with JAB Holdings—and never conducted a market check.

46.     During September 2015, representatives of JAB Holdings contacted defendant Morgan to express interest in a meeting to discuss the Company and to introduce him to JAB Holdings.   Defendant Morgan met with JAB Holdings representatives on October 6, 2015.   At the meeting, the parties held preliminary discussions regarding potential strategic relationships between JAB Holdings and the Company.   After the meeting, defendant Morgan updated certain members of the Board regarding the meeting, including defendants Thompson and McCoy.

47.     On October 21, 2015, defendant Thompson met with JAB Holdings' Mike Tattersfield ("Tattersfield") and held preliminary discussions regarding Krispy Kreme's performance and prospects.   Two days later, defendants Morgan and Thompson received an invitation to visit JAB Holdings' Washington, D.C. office.   At the November 5, 2015 meeting, JAB Holdings' Olivier Goudet ("Goudet") indicated that JAB Holdings would be interested in making a confidential proposal to acquire the Company for $18.75 per share in cash.   Goudet further indicated that JAB Holdings did not engage in unfriendly initiatives or auction processes and would withdraw if Krispy Kreme was not interested or wished to seek proposals from other potential acquirers.

48.     On November 23, 2015, the Board held a special telephonic meeting to discuss JAB Holdings' indication of interest.   The Board decided to engage a financial advisor in connection with a possible sale or other strategic transaction involving the Company.

49.     On December 15 and 16, 2015, the Board held an in-person meeting, during which the Board discussed JAB Holdings' indication of interest.  The Board invited Wells

Fargo to attend the meeting, and held a discussion concerning management's belief that the Company would be more successful over the long-term by transitioning to more of a franchise-based system. Without authorizing an outreach process or market check, the Board determined to continue to engage JAB Holdings.

50. On December 17, 2015, defendant Morgan informed representatives of JAB Holdings that their $18.75 per share offer was not sufficiently attractive and that the Board would consider a revised proposal.

51. On December 31, 2015, the Board held a special telephonic meeting during which the Board formally engaged Wells Fargo as financial advisor to the Company. The Board discussed Wells Fargo's prior relationships with Krispy Kreme and JAB Holdings, neither of which are disclosed in the Proxy. The Proxy further fails to disclose whether any members of the Krispy Kreme deal team had worked on previous engagements for JAB Holdings. An engagement letter with Wells Fargo was executed that day.

52. In January 2016, defendant Thompson received a call from a representative of a private equity firm that expressed interest in learning more about the Company. Defendant Thompson subsequently brought the call to the attention of the Board. Defendant Thompson and Krispy Kreme Chief Financial Officer ("CFO") Price Cooper ("Cooper") met with the representative of the private equity firm on February 9, 2016. A subsequent meeting took place on February 29, 2016, though the private equity firm did not follow up with Krispy Kreme in a "substantive manner."

53.     On or around January 29, 2016, representatives of JAB Holdings informed defendant Morgan that JAB Holdings continued to be interested in pursuing a transaction with the Company, and that it was willing to increase its initial offer.

54.     On March 15, 2016, the Board held a meeting during which members of management presented the Company's updated long-term strategic plan, which reflected a shift toward a more franchise-based business model.     The presentation included management's financial plan and a discussion of near-term operational and financial risks associated with such a strategy.     Management reaffirmed that the best way to continue growing the Krispy Kreme brand was through a more franchise-based focus.

55.     On April 1, 2016, Goudet telephoned defendant Morgan and made an oral offer to acquire the Company for $19.50 per share, subject to satisfactory due diligence. Goudet indicated JAB Holdings was prepared to initiate the due diligence process and might consider revisiting its offer price after the completion of such due diligence. Goudet reiterated that JAB Holdings would disengage with the Company if Krispy Kreme chose to seek other potential offers.

56.     On April 4, 2016, the Board held a meeting to discuss JAB Holdings' revised offer.     Wells Fargo informed the Board that it believed it was unlikely that a financial buyer would be interested in making a fully financed, non-contingent offer to acquire Krispy Kreme at a price per share greater than $19.50.     While the Board deemed the $19.50 per share offer too low, it determined to enter into a confidentiality and standstill agreement with JAB Holdings in order to engage in a due diligence review.     The confidentiality and standstill agreement was executed on April 8, 2016.

57.     On May 3, 2016, the Board held an in-person meeting during which Wells Fargo revised and discussed preliminary financial analyses.  Wells Fargo also reiterated their view that there was a limited likelihood that a strategic buyer would be interested in a transaction with the Company, and that it was unlikely a financial buyer would be interested in a price per share greater than $19.50.  The Board also discussed the consequences of a "no-solicitation" provision and whether to request a "go-shop" provision.  The Board reaffirmed its prior determination that an offer of $19.50 per share was not sufficiently compelling.

58.     On May 4, 2016, Goudet telephoned defendant Morgan and delivered an oral proposal to acquire the Company for $20.50 per share in exchange for the Company agreeing to a "no-solicitation" provision and a $50 million termination fee.

59.     On May 5, 2016, the Board held a special telephonic meeting to discuss the revised proposal.  The Board determined that it would continue to request a "go-shop" provision unless the purchase price could be increased to $21.00 per share and the termination fee lowered to $42 million.  The Board's determination was subsequently communicated to JAB Holdings, and later that afternoon JAB Holdings agreed to the Board's conditions.

60.     On May 7, 2016, the Board held a special telephonic meeting during which Wells Fargo reviewed and discussed their financial analyses with regarding to the Company and the Proposed Transaction.  Wells Fargo provided its written fairness opinion that day, and the Board adopted, approved and declared advisable the Merger Agreement and the Proposed Transaction.

17

61.     Following the meeting, the Company, JAB Holdings, Parent and Merger Sub executed the Merger Agreement.

**The Proposed Transaction is Inadequate**

62.     On May 8, 2016, following the Board's approval, Krispy Kreme entered into the Merger Agreement with JAB Holdings and its subsidiaries for inadequate consideration.  The next day, Krispy Kreme and JAB Beech issued a joint press release stating, in relevant part:

> WINSTON-SALEM, N.C.-- Krispy Kreme Doughnuts, Inc. (NYSE: KKD) ("Krispy Kreme" or the "Company") and JAB Beech Inc., an indirect controlled subsidiary of JAB Holding Company ("JAB") in which BDT Capital Partners is a minority investor alongside JAB, today announced that the companies have entered into a definitive merger agreement under which JAB Beech will acquire Krispy Kreme for $21 per share in cash, or a total equity value of approximately $1.35 billion. The agreement, which has been unanimously approved by Krispy Kreme's Board of Directors, represents a premium of approximately 25% over the Company's closing stock price on May 6, 2016.
>
> At the close of the transaction, Krispy Kreme will be privately owned and will continue to be independently operated from Krispy Kreme's current headquarters in Winston-Salem, N.C.
>
> * * *
>
> The transaction is not subject to a financing condition and is expected to close in the third quarter, subject to customary closing conditions, including receipt of regulatory and shareholder approvals.

63.     The Merger Consideration fails recognize the value of Krispy Kreme to JAB Holding.  In the joint press release, JAB Holding Company Senior Partner Peter Harf ("Harf") commented on the benefits his investment group will enjoy as a result of the Proposed Transaction:

We are thrilled to have such an iconic brand as Krispy Kreme joining the JAB portfolio. This is yet another example of our commitment to investing in extraordinary brands with significant growth prospects. We feel strongly that Krispy Kreme will benefit greatly from our long-term focus and support for management's vision in building on the legacy of this exciting brand as an independent standalone entity.

64.     The $21.00 per share implied value of the Merger Consideration falls below Krispy Kreme's trading price of $21.65 on March 5, 2015, just over a year prior to the announcement of the Proposed Transaction.

65.     Moreover, as recently as March 22, 2016, analyst Anton J. Brenner at Roth Capital Partners set a $24.00 target price for Krispy Kreme, which is $3.00 above the $21.00 Merger Consideration.

66.     On May 5, 2016, just four days before the Proposed Transaction was announced, an article was published by *Seeking Alpha* entitled "Krispy Kreme Will Be A Better Investment Than Starbucks This Year."  The article provided three reasons why Krispy Kreme is a good investment:

We are bullish on Krispy Kreme thanks to its international expansion. There had been fears previously about the fact around 30% of its international store network were in oil-centric economies. There were fears that consumer spending may be low and results would be negatively impacted. As we said previously, consumer spending in Mexico and Saudi Arabia is rising despite the fall in oil prices. There was no data provided for the UAE, but we would presume it is a similar story to Saudi Arabia. Also, since we last spoke about Krispy Kreme the oil price has rallied which should hopefully give a boost to businesses in these economies should it be necessary.

The other attraction and unique selling point for Krispy Kreme is its ability to produce limited time offerings at a whim. We feel limited time offerings are a great way of increasing impulsive purchases, bringing customers back time and time again, and great at raising awareness through social media.

Some of its LTOs can be quite shareable on social media, which is a brilliant source of free advertising for the company.

Finally, the other key reason we are bullish on Krispy Kreme and expect great results from the company is the fact it is converting stores into a more coffee-centric layout. The stores that have been converted look an awful lot like a Starbucks store, and we expect it will increase coffee sales dramatically by appealing to a broader demographic that may not want doughnuts. While we don't think it will ever replace Starbucks as "the third place" we do think it will become a place that consumers do treat in a similar way. Ultimately, we think this change will only do the company good in the long run.

67.    Reaction to the Proposed Transaction has been negative.  For example, in a May 10, 2016 *The Street* article entitled "Krispy Kreme Deal Actually Signals McDonald's Is Undervalued," author Brian Sozzi ("Sozzi") stated that JAB Holdings "will realize over time it got Krispy Kreme at a steal of a price."  Sozzi elaborated:

Krispy Kreme makes a quality product that calorie counting Americans still enjoy. The brand is a well-known American company, unlike Restaurant Brand's Canadian Tim Horton's concept that has mostly failed at cracking the U.S. market. The company has a ***clean balance sheet, very able management and huge avenues for growth*** via a name that is still viewed positively amongst consumers. So, **JAB acted at the right moment in time** in light of Krispy Kreme's weak stock price and mixed same-store sales of late (though still up in a highly competitive market).

Emphasis added.

68.    Also on May 10, 2016, *The Street* published an article by Jonathan Heller ("Heller") entitled "The Krispy Kreme Takeout Price Is Ridiculous."  In the article, Heller noted that he is "not happy" with the Merger Consideration.  Stating that "this was a company on the mend and the future was bright," Heller noted that he would "have been much happier with a $27-a-share takeout price, which represents 30x next year's consensus earnings estimates."  The article further noted that JAB Holdings will acquire a

thriving international franchise business, a "nice real estate portfolio" and "a company with a very clean balance sheet, including $51 million in cash and just $12 million in debt."

69. In a May 10, 2016 *Seeking Alpha* article entitled "Krispy Kreme Taken Private, Will Cheesecake Factory Be Next?" the author explained that the Proposed Transaction "fell short of what we deemed fair value" and "JAB Holding Company may have gotten itself a bit of a bargain here."

**The Board Impermissibly Locked Up the Proposed Transaction**

70. The Merger Agreement contains deal protection devices which substantially increase the likelihood that the Proposed Transaction will be consummated, leaving Krispy Kreme's public shareholders with no meaningful change of control premium for their shares. When viewed collectively, these provisions, which are detailed below, further the interests of JAB Holdings, certain Individual Defendants and other Krispy Kreme insiders to the detriment of Krispy Kreme's public shareholders and cannot represent a justified, appropriate or proportionate response to any threat posed by a potential third party bidder.

71. The Individual Defendants have agreed to the following unreasonable deal protection devices:

• A "no-solicitation" clause that prevents Krispy Kreme from soliciting, or its directors and officers from even participating in discussions which may lead to a superior proposal from any bidder (Merger Agreement, Section 6.3(a));

- An "information rights" provision that requires the Company to promptly advise JAB Holdings of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal (Merger Agreement, Section 6.3(f));

- A "matching rights" provision that allows JAB Holdings three (3) business days to re-negotiate with the Board after it is provided with written notice of the Board's intention to make a change of recommendation (Merger Agreement, Section 6.3(c));

- A "no-waiver" provision restricting the Company and its subsidiaries from terminating, amending, modifying or waiving any material provision of any confidentiality or similar agreement to which Krispy Kreme or any of its subsidiaries is a party (Merger Agreement, Section 6.3(e)); and

- A termination fee of $42 million payable by the Company to JAB Holdings if Krispy Kreme decides to pursue a competing bid (Merger Agreement, Section 8.5).

72. The "no-solicitation" clause, the "information rights" provision, the "matching rights" provision, the "no-waiver" provision and the termination fee unfairly restrain the Individual Defendants' ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to a third party's written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

73. The reason behind these deal protection devices is clear: the absence of a meaningful premium for shareholders creates the very real potential that a third party bidder will attempt to usurp JAB Holdings and submit a higher bid for Krispy Kreme. The possibility that a third-party bidder will emerge motivated JAB Holdings to "lock-up" the Proposed Transaction by co-opting the Board and forcing them to adopt unreasonable deal protection devices that would ensure that JAB Holdings could purchase the Company for less than would otherwise be possible.

74. Taken as a whole, the foregoing deal protection devices and the voting agreements essentially foreclose the possibility that a third-party "white knight" could step forward to provide Krispy Kreme shareholders with a premium for their shares, instead of the opportunistic and inadequate compensation offered by the Proposed Transaction.

**Insiders' Interests in the Proposed Transaction**

75. JAB Holdings and Krispy Kreme insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public shareholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiffs and the public shareholders of Krispy Kreme.

76. Notably, according to the May 9, 2016 joint press release announcing the Proposed Transaction, it appears that Krispy Kreme's current management team will enjoy continued employment following consummation of the Proposed Transaction – a unique benefit not available to the Company's public stockholders. In the joint press

release, defendant Thompson stated: "We look forward to working with JAB to continue bringing the joy that is *Krispy Kreme* to a growing number of customers. Together with our talented team and our passionate franchisees, we will continue to build on the Krispy Kreme culture, values and commitment to our customers and guests." Harf also stated in the joint press release that the Company would continue operating as "an independent standalone entity" and JAB Holdings would provide "support for management's vision."

77. While Krispy Kreme's public shareholders are receiving inadequate consideration for their valuable Krispy Kreme holdings, the Company's directors and officers will achieve a substantial payday. Pursuant to the Merger Agreement, upon consummation of the merger, Krispy Kreme's directors and officers will receive cash payments from the immediate vesting of all outstanding stock options and equity incentive plan awards, whether or not vested - an opportunity that would not otherwise be available. The following table summarizes the aggregate amount payable to the Company's directors and executive officers in connection with the Proposed Transaction for their unvested stock options and unvested share units:

Case 1:16-cv-00923-WO-JLW   Document 1   Filed 07/08/16   Page 24 of 41

| Directors and Executive Officers | Aggregate Amount Payable for Unvested Stock Options ($) (1) | Aggregate Amount Payable for Unvested Share Units ($) (2) |
|---|---|---|
| *Directors* | | |
| Tim E. Bentsen | — | 119,994 |
| Charles A. Blixt | — | 119,994 |
| Lynn Crump-Caine | — | 119,994 |
| Carl E. Lee, Jr. | — | 119,994 |
| C. Stephen Lynn | — | 119,994 |
| Robert S. McCoy, Jr. | — | 119,994 |
| James H. Morgan | — | 173,985 |
| Andrew J. Schindler | — | 119,994 |
| Michael H. Sutton (3) | — | — |
| Lizanne Thomas | — | 119,994 |
| Togo D. West, Jr. (4) | — | — |
| *Executive Officers* | | |
| Tony N. Thompson | 80,017 | 2,705,178 |
| Cathleen D. Allred | 486 | 481,383 |
| G. Price Cooper, IV | — | 2,284,863 |
| Daniel L. Beem | 15,799 | 619,269 |
| Thomas E. Kuharcik | — | 772,821 |
| Douglas R. Muir (5) | — | — |
| Cynthia A. Bay (6) | — | — |

78.     Further, if they are terminated in connection with the Proposed Transaction, Krispy Kreme's named executive officers are set to receive substantial cash payments in the form of merger-related compensation.   Defendant Thompson **alone** stands to receive over $6.1 million in severance benefits if he is not retained after consummation of the Proposed Transaction, as detailed in the chart below:

| Name | Cash ($)(1) | Equity ($)(2) | Total ($) |
|---|---|---|---|
| Tony N. Thompson | 3,331,649 | 2,785,195 | 6,116,844 |
| G. Price Cooper, IV | 1,439,814 | 2,284,863 | 3,724,677 |
| Daniel L. Beem | 1,204,669 | 635,068 | 1,839,737 |
| Thomas E. Kuharcik | 1,126,184 | 772,821 | 1,899,005 |
| Douglas R. Muir | — | — | — |
| Cynthia A. Bay | — | — | — |

79.     Moreover, Krispy Kreme's directors and officers will receive substantial cash consideration for their significant holdings of Krispy Kreme stock.  By pursuing and approving the Proposed Transaction, the Company's directors and officers will

gain liquidity for their otherwise illiquid Company holdings. The holdings of the Company's officers and directors were disclosed in the Proxy, as seen in the following chart:

| Name of Beneficial Owner | Number of Shares Beneficially Owned | Percentage of Beneficial Ownership |
|---|---|---|
| Directors and Executive Officers: | | |
| Cynthia A. Bay (1) | 425,268 | *% |
| Daniel L. Beem (2) | 10,354 | * |
| Tim E. Bentsen (3) | 7,966 | * |
| Charles A. Blixt (4) | 227,826 | * |
| Price Cooper | 16,339 | * |
| Lynn Crump-Caine (5) | 227,826 | * |
| Tom Kuharcik (6) | 4,067 | * |
| Carl E. Lee, Jr. (7) | 12,966 | * |
| C. Stephen Lynn (8) | 227,826 | * |
| Robert S. McCoy, Jr. (9) | 239,533 | * |
| James H. Morgan (10) | 1,032,733 | 1.7 |
| Douglas R. Muir (11) | 308,568 | * |
| Andrew J. Schindler (12) | 239,533 | * |
| Lizanne Thomas (13) | 239,983 | * |
| Tony Thompson (14) | 81,240 | * |
| All directors and executive officers as a group (17 persons) | 3,336,706 | 5.5 |

80. Therefore, while Krispy Kreme's public shareholders will lose control of the Company for an unfair price, certain Company insiders will substantially benefit—both monetarily and through potential continued employment if the Proposed Transaction is consummated.

**The Proxy Contains Numerous Material Misstatements or Omissions**

81. Compounding the unfair sale process and the inadequacy of the Merger Consideration, the defendants also filed the materially incomplete and misleading Proxy with the SEC and disseminated it to Krispy Kreme's shareholders. The Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed decision whether to vote in favor of the Proposed Transaction.

82.     Specifically, as set forth below, the Proxy fails to provide Company shareholders with material information or provides them with materially misleading information concerning: (i) the valuation analyses prepared by Wells Fargo in connection with the rendering of its fairness opinion; (ii) Krispy Kreme management's projections, utilized by Wells Fargo in their financial analyses; and (iii) material information concerning the sale process leading up to the Proposed Transaction. Accordingly, Krispy Kreme shareholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning Wells Fargo's Financial Analyses***

83.     The Proxy describes Wells Fargo's fairness opinion and the various valuation analyses it performed in support of its opinion. However, the description of Wells Fargo's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, Krispy Kreme's public shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Wells Fargo's fairness opinion in determining whether to vote in favor of the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Krispy Kreme's shareholders.

84.     Wells Fargo performed a *Selected Companies Analysis* that was presented to the Board, yet the Proxy fails to disclose certain individual multiples for each of the selected public companies analyzed by Wells Fargo, as well as any benchmarking analyses Wells Fargo performed for Krispy Kreme in relation to the selected public

companies. Specifically, Wells Fargo fails to disclose the following individual multiples for each of the selected public companies analyzed:

(a)     EV / CY 2016E EBITDA

(b)     EV / CY 2017P EBITDA

(c)     EV / CY 2016E EPS

(d)     EV / CY 2017P EPS

85.     Omission of the individual multiples and the benchmarking analyses make the following Proxy information false and/or misleading:

(a)     from pages 40-41 of the Proxy:

*Selected Companies Analysis*

Wells Fargo Securities reviewed certain data for selected companies with publicly traded equity securities that Wells Fargo Securities deemed relevant. The selected companies were selected because they were deemed by Wells Fargo Securities to be similar to the Company in one or more respects.

The financial data reviewed included:

- Enterprise Value as a multiple of estimated EBITDA for the calendar year 2016, or "CY 2016E EBITDA";

- Enterprise Value as a multiple of projected EBITDA for the calendar year 2017, or "CY 2017P EBITDA";

- Share price as a multiple of estimated earnings per share for the calendar year 2016, or "CY 2016E EPS"; and

- Share price as a multiple of projected earnings per share for the calendar year 2017, or "CY 2017P EPS.

The selected companies and mean, median, high and low of such financial data for the selected companies were:

Dunkin' Brands Group, Inc.
Panera Bread Company
The Wendy's Company
Jack in the Box Inc.
Papa John's International Inc.
Sonic Corp.
Popeyes Louisiana Kitchen, Inc.
Bojangles', Inc.

| Enterprise Value / | Mean | Median | High | Low |
|---|---|---|---|---|
| CY 2016E EBITDA | 12.6x | 13.1x | 14.3x | 9.8x |
| CY 2017P EBITDA | 11.8x | 12.2x | 13.5x | 9.6x |
| CY 2016E EPS | 24.3x | 24.4x | 31.5x | 18.4x |
| CY 2017P EPS | 21.4x | 21.1x | 26.9x | 16.9x |

Taking into account the results of the selected companies analysis, Wells Fargo Securities applied a multiple range of 12.0x to 14.0x based on the CY 2016E EBITDA multiples for the selected companies to the Company's estimated EBITDA for the fiscal year ending January 31, 2017, or "FY 2017E EBITDA"; a multiple range of 11.0x to 13.0x based on the CY 2017P EBITDA multiples for the selected companies to the Company's projected EBITDA for the fiscal year ending January 31, 2018, or "FY 2018P EBITDA"; a multiple range of 25.0x to 30.0x based on the CY 2016E EPS multiples for the selected companies to the Company's estimated earnings per share for the fiscal year ending January 31, 2017, or "FY 2017E EPS"; and a multiple range of 20.0x to 25.0x based on the CY 2017P EPS multiples for the selected companies to the Company's projected earnings per share for the fiscal year ending January 31, 2018, or "FY 2018P EPS." The selected companies analysis indicated implied valuation reference ranges per share of $15.61 to $18.15 based on the Company's FY 2017E EBITDA, $15.59 to $18.36 based on the Company's FY 2018P EBITDA, $14.79 to $17.73 based on the Company's FY 2017E EPS, and $14.34 to $17.89 based on the Company's FY 2018P EPS, as compared to the proposed merger consideration in the merger pursuant to the merger agreement of $21.00 per share.

86. Similarly, Wells Fargo performed a *Selected Transactions Analysis* that was presented to the Board, yet the Proxy fails to disclose the individual EV / LTM EBITDA multiples for each of the target companies analyzed by Wells Fargo in its analysis.

87. Omission of the individual transaction multiples make the following Proxy information false and/or misleading:

(a) from pages 41-42 of the Proxy:

*Selected Transactions Analysis*

Wells Fargo Securities considered certain financial terms of certain transactions involving target companies that Wells Fargo Securities deemed relevant. The selected transactions were selected because they involved target companies that were deemed by Wells Fargo Securities to be similar to the Company in one or more respects.

The financial data reviewed included Enterprise Value as a multiple of Adjusted EBITDA for the last twelve months prior to the announcement of the applicable transaction ("LTM Adjusted EBITDA").

The selected transactions and mean, median, high and low of such financial data for the selected transactions were:

| Closed Date | Target | Acquiror |
|---|---|---|
| 6/2015 | Del Taco Restaurants, Inc. | Levy Acquisition Corp |
| 12/2014 | Tim Hortons Inc. | Burger King Worldwide, Inc. |
| 11/2014 | Einstein Noah Restaurant Group, Inc. | JAB Holdings Company |
| 1/2013 | Caribou Coffee Company, Inc. | JAB Holdings Company |
| 12/2012 | Teavana Holdings, Inc. | Starbucks Corporation |
| 10/2012 | Peet's Coffee & Tea, Inc. | JAB Holdings Company |
| 7/2012 | PF Chang's China Bistro, Inc. | Centerbridge Partners |
| 7/2011 | California Pizza Kitchen, Inc. | Golden Gate Capital |
| 7/2011 | Arby's Restaurant Group, Inc. | Roark Capital |
| 10/2010 | Burger King Worldwide, Inc. | 3G Capital |
| 7/2010 | CKE Restaurants Inc. | Apollo Global Management |

Taking into account the results of the selected transactions analysis, Wells Fargo Securities applied a multiple range of 11.5x to 15.5x based on the LTM Adjusted EBITDA multiples for the target companies in the selected transactions to the Company's Adjusted FY 2016 EBITDA. The selected transactions analysis indicated an implied valuation reference range per share of $13.33 to $17.85, as compared to the proposed merger consideration in the merger pursuant to the merger agreement of $21.00.

88. With respect to the *Discounted Cash Flow Analysis* Wells Fargo performed on Krispy Kreme, the Proxy fails to disclose: (a) the individual inputs and assumptions

that Wells Fargo used for the selection of discount rates of 9.0% - 10.0%; (b) the implied

terminal EBITDA multiples observed from this analysis; (c) the identity, quantity and

source of the weighted average cost of capital ("WACC") assumptions utilized; and (d)

whether Wells Fargo treated stock-based compensation as a cash or non-cash expense.

89.     Omission of the key inputs and assumptions underlying the Wells Fargo's

discounted cash flow analysis make the following Proxy information false and/or

misleading:

(a)     from page 42 of the Proxy:

*Discounted Cash Flow Analysis*

Wells Fargo Securities performed a discounted cash flow analysis of the
Company by calculating the estimated net present value of the projected
unlevered, after-tax free cash flows of the Company based on the financial
projections. For purposes of the discounted cash flow analyses, Wells Fargo
Securities applied perpetuity growth rates ranging from 2.0% to 4.0% and
discount rates ranging from 9.0% to 10.0%. The discounted cash flow
analysis indicated an implied valuation reference range per share of $13.75
to $20.39, as compared to the proposed merger consideration in the merger
pursuant to the merger agreement of $21.00.

90.     The Proxy is false or misleading due to the omissions identified in

paragraphs 83, 85 and 87.   Without such undisclosed information, Krispy Kreme

stockholders cannot evaluate for themselves whether the financial analyses performed by

Wells Fargo were based on reliable inputs and assumptions or whether they were

prepared with an eye toward ensuring that a positive fairness opinion could be rendered

in connection with the Proposed Transaction.   In other words, full disclosure of the

omissions identified above is required in order to ensure that stockholders can fully

evaluate the extent to which Wells Fargo's opinions and analyses should factor into their voting decision.

***Material Omissions Concerning Krispy Kreme's Financial Projections***

91.　　The Proxy indicates that Wells Fargo relied on certain internal projections for fiscal years 2016-2023 in rendering its fairness opinion. However, the Proxy omits the Company's internal projections for the following items: (a) total shops/stores in each year; (b) taxes (or tax rate); (c) changes in net working capital; and (d) stock-based compensation expenditure.

92.　　The Proxy also omits information concerning the expected gain from the sale of 51 Krispy Kreme currently owned shops to franchisees in 2019, and whether this gain was modeled into any of the valuations performed by Wells Fargo as a present value of after-tax proceeds.

93.　　The failure to disclose the financial forecast information set forth above, renders the following information from the Proxy false and/or misleading:

(a)　　from pages 36-37 of the Proxy:

The financial projections resulted in the following estimates of the Company's future financial performance:

Projections ($ in millions, except diluted earnings per share)

| | Fiscal Year | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E |
| System-Wide New Shop Openings, Net(1) | 169 | 159 | 224 | 244 | 269 | 299 | 324 |
| Total Revenue(2) | $ 555.9 | $ 595.0 | $ 582.5 | $ 646.6 | $ 707.9 | $ 772.9 | $ 841.5 |
| EBIT(3) | $ 64.4 | $ 70.9 | $ 75.9 | $ 89.7 | $ 102.6 | $ 116.7 | $ 131.6 |
| EBITDA(3) | $ 82.2 | $ 89.6 | $ 90.0 | $ 103.6 | $ 116.8 | $ 131.4 | $ 146.8 |
| Net Income(3) | $ 37.5 | $ 40.7 | $ 42.4 | $ 49.7 | $ 56.8 | $ 64.6 | $ 72.8 |
| Diluted Earnings Per Share(3) | $ 0.59 | $ 0.71 | $ 0.86 | $ 1.12 | $ 1.36 | $ 1.63 | $ 1.91 |

(1) The vast majority of these shops are assumed to be alternative shop-type formats. These figures also assume five company shop openings per year in fiscal years 2018 through 2023.

(2) The decrease in fiscal 2019 is a result of the assumed sale of 51 currently Company-owned shops to franchisees. It is assumed that the Company will retain the CPG (Consumer Packaged Goods) portion in the case of any dual-channel shops.

(3) Financial information has been prepared on a basis consistent with our historical GAAP financial statements, except for the fact that EBIT, EBITDA, Net Income, and Diluted Earnings Per Share for fiscal year 2019 exclude the effect of any potential one-time gain in conjunction with the sale of shops to franchisees.

EBITDA is a non-GAAP financial measure. Non-GAAP financial measures are not calculated in accordance with, and are not a substitute for financial measures calculated in accordance with, GAAP and may be different from non-GAAP financial measures used by other companies. Furthermore, there are limitations inherent in non-GAAP financial measures, in that they exclude a variety of charges and credits that are required to be included in a GAAP presentation.

**Cash Flow Information ($ in millions)**

| | Fiscal Year | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E |
| **Cash Flow from Operations(1)** | $ 85.1 | $ 89.5 | $ 52.1 | $ 74.2 | $ 81.7 | $ 90.2 | $ 99.0 |
| **Capital Expenditures** | $ 37.0 | $ 24.9 | $ 22.2 | $ 21.4 | $ 21.6 | $ 21.8 | $ 22.0 |
| **Free Cash Flow** | $ 48.1 | $ 64.6 | $ 29.9 | $ 52.8 | $ 60.1 | $ 68.4 | $ 77.0 |

Note: the above cash flow information excludes any proceeds received in conjunction with the selling of 51 shops to franchisees.

(1) The financial projections assume the Company's Net Operating Loss is fully utilized as of the end of fiscal year 2019.

94. These material omissions of the best estimates of the Company's financial future misleads Krispy Kreme shareholders by providing only selected information. The omission needs to be remedied prior to the shareholder vote in order to allow Krispy Kreme shareholders to make a fully informed decision on the Proposed Transaction.

*Material Omissions Concerning the Flawed Sale Process*

95.     The Proxy also fails to disclose material information relating to, among other things, the sale process leading up to the Proposed Transaction, including:

(a)     The specific possible strategic relationships between JAB Holdings and Krispy Kreme that were reviewed between the parties on October 6, 2015;

(b)     The details of Wells Fargo's prior relationships with Krispy Kreme and JAB Holdings or its affiliates, including a description of work performed, the fees provided to Wells Fargo by Krispy Kreme or JAB Holdings and its affiliates for these services and whether any members of the Krispy Kreme deal team was previously engaged to perform work for JAB Holdings or its affiliates;

(c)     The Board's rationale for engaging Wells Fargo as the Company's financial advisor, and whether the Board considered Wells Fargo's holding nearly 8% of the Company's outstanding shares as a conflict of interest;

(d)     The reasons why the Board allowed defendant Morgan to negotiate on behalf of the Company despite being conflicted due to the benefits he stood to receive from the Proposed Transaction;

(e)     The reasons why the Board solely negotiated with JAB Holdings and failed to authorize an outreach process or market check;

(f)     The timing and nature of all communications regarding future employment or directorship of Krispy Kreme's officers and directors, including who participated in all such communications;

(g)     The specific valuation for Krispy Kreme that the Board discussed at its November 23, 2016 meeting;

(h)     The specific potential strategic alternatives for Krispy Kreme as reviewed by Wells Fargo;

(i)     The valuation of Krispy Kreme discussed at the Board's November 23, 2015 meeting and the basis for that valuation;

(j)     The reasons why the Board believed that JAB Holdings' December 2015 acquisition of Keurig would not interfere with a transaction involving Krispy Kreme;

(k)     The specific factors that led the Board to determine at its December 31, 2016 meeting that the JAB Holdings proposal undervalued Krispy Kreme;

(l)     The specific impacts to earnings growth and EBITDA of shifting toward a more franchise-based business model as reviewed by Company management on March 15, 2016, the rationale discussed by the Board for moving to a franchise-based model, and any risks discussed by the Board concerning a move to a franchise-based model;

(m)     The number of potential strategic and financial acquirers of Krispy Kreme discussed by Wells Fargo with the Board;

(n)     Whether the Company has entered into any confidentiality agreements with parties besides JAB Holdings that contain standstill provisions that would preclude these parties from making a topping bid for Krispy Kreme;

(o)     The reasons why the Company or Wells Fargo did not contact the private equity group defendant Thompson and Cooper met with on February 9, 2016;

35

(p)    The reason why the Board agreed to a "no-solicitation" provision in the Merger Agreement, when it previously sought to have a "go-shop" provision;

(q)    The specific factors that led to the Board determining that the JAB Holdings April 1, 2016 proposal undervalued the Company; and

(r)    The JAB Holdings affiliate with which the Company entered into a confidentiality agreement on April 18, 2016;

96.    Failing to disclose this information misleads shareholders as to any potential conflicts that would lead Krispy Kreme or Wells Fargo to favor JAB Holdings over other potential buyers, which is particularly critical here as the Board failed to conduct any market check.

97.    Defendants' failure to provide Krispy Kreme shareholders with the foregoing material information renders the statements in the "Background of the Merger" and "Reasons for the Merger and Recommendation of the Board of Directors" sections of the Proxy false and/or materially misleading and constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder.   The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy. Absent disclosure of the foregoing material information prior to the shareholder vote on the Proposed Transaction, Plaintiffs and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

# CLAIMS FOR RELIEF

## COUNT I

**Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act And SEC Rule 14a-9 Promulgated Thereunder**

98. Plaintiffs repeat all previous allegations as if set forth in full.

99. SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

100. During the relevant period, defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

101. By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by the defendants. The Proxy misrepresented and/or omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed

37

Transaction, and the actual intrinsic value of the Company's assets. The defendants were at least negligent in filing the Proxy with these materially false and misleading statements. The defendants have also failed to correct the Proxy and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

102. The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

103. By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

104. Because of the false and misleading statements in the Proxy, Plaintiffs and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Class Claims Against the Individual Defendants for
### Violation of Section 20(a) of the Exchange Act

105. Plaintiffs repeat all previous allegations as if set forth in full.

106. The Individual Defendants acted as controlling persons of Krispy Kreme within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers or directors of Krispy Kreme and participation in or awareness

38

of the Company's operations or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

107.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

108.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.    The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.    They were, thus, directly involved in the making of this document.

109.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

110. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment and preliminary and permanent relief, including injunctive relief, in their favor on behalf of Krispy Kreme, and against defendants, as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiffs as the Class representative and Plaintiffs' counsel as Class counsel;

B. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction;

C. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiffs and the Class;

D. Awarding Plaintiffs the costs of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

E. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: July 8, 2016

/s/ Stuart H. Russell

**WILSON & HELMS LLP**
Stuart H. Russell (Bar No. 34959)
110 Oakwood Drive, Suite 400
Winston-Salem, North Carolina 27103
Tel: (336) 631-8866
Fax: (336) 631-9770
srussell@wilsonhelms.com

**WEISSLAW LLP**
/s/ Richard A. Acocelli
Richard A. Acocelli
/s/ Michael A. Rogovin
Michael A. Rogovin
/s/ Kelly C. Keenan
Kelly C. Keenan
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010
racocelli@weisslawllp.com
mrogovin@weisslawllp.com
kkeenan@weisslawllp.com

**BRAGAR EAGEL & SQUIRE P.C.**
/s/ J. Brandon Walker
J. Brandon Walker
885 Third Avenue, Suite 3040
New York, New York 10022
(212) 308-5858
walker@bespc.com

*Attorneys for Plaintiffs*